IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 5, 2007

# BRIDGETT HILL, ET AL. v. NHC HEALTHCARE/NASHVILLE, LLC, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 03C2808     Walter Kurtz, Judge**

---

**No. M2005-01818-COA-R3-CV - Filed April 30, 2008**

---

The administrators of the estate of a woman who died after being transported by ambulance from a nursing home to a hospital filed a wrongful death suit which named the nursing home and the ambulance service as defendants. The nursing home responded with a motion to compel arbitration, citing a provision in the admissions agreement which the decedent had signed, requiring both parties to submit any disputes to arbitration and to waive their rights to jury trial. The trial court found the arbitration clause to be unconscionable and denied the motion. The nursing home then filed a direct appeal to this court pursuant to Tenn. Code Ann. § 29-5-319. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J. delivered the opinion of the court. FRANK G. CLEMENT, JR., J. filed a concurring opinion. WILLIAM B. CAIN, J., not participating.

John B. Curtis, Jr., Bruce D. Gill, Chattanooga, Tennessee, for the appellants, NHC Healthcare/Nashville, LLC; and National Healthcare Corp.

Joseph K. Dughman, James W. Tiller, Nashville, Tennessee, for the appellees, Bridget Hill, and Janece Wilson, as co-administratrices of the estate of Barbara Hill, deceased.

## OPINION

### I. A CONTRACT BETWEEN A PATIENT AND A NURSING HOME

Barbara Hill was a sixty year-old woman who suffered from a number of serious medical conditions including congestive heart failure, chronic obstructive pulmonary disease, coronary artery disease and hypertension. She developed pneumonia and was admitted to the hospital. Upon her

release from the hospital on May 28, 2003, she was referred to the defendant nursing home, operated by defendant NHC Healthcare/Nashville, LLC (hereinafter "NHC") for further treatment.

At NHC, Ms. Hill was given an "Admission and Financial Contract" to sign. Section H of the thirteen page document was titled "Dispute Resolution Procedure." Under its provisions, the patient or her representative was allowed to submit any dispute with the nursing home to mediation. In the event that mediation failed or the patient chose not to use that method of resolution, the aggrieved party's only avenue of recourse was binding arbitration, to be administered by either the American Arbitration Association (AAA) or the American Health Lawyers Association (AHLA).[1]

A sentence in somewhat bolder letters than the rest of section H stated that "[b]y agreeing to arbitration of all disputes, both parties are waiving a jury trial for all contract, tort, statutory, regulatory or other claims."[2] At the bottom of the section was a box with bold letters containing the words, "I am in total agreement with the arbitration procedures described above in Section H, including the use where applicable of the AAA Defined 'Consumer-Related Disputes.' The provisions of this Section H have been reviewed with me prior to my signature below."

The box referenced above and the contract itself were signed by Barbara Hill, as well as by her daughter, Janece Wilson on May 29, 2003. The nursing home representative John Houmes signed the contract on the following day. Ms. Hill's brother Larry Jordan added his signature to both the box and the contract on June 4, 2003. Mr. Jordan served as Ms. Hill's attorney in fact under a power of attorney and a durable power of attorney for healthcare. However, the parties acknowledge that Ms. Hill was competent at the time the contract was executed, so the additional signatures of Ms. Wilson and Mr. Jordan have no legal significance in this appeal.

Barbara Hill was dependent on the continuous administration of oxygen when she was admitted to the nursing home, and presumably was receiving oxygen at the time she signed the contract. On June 4, 2003, she was released from NHC and went home to her family where she was to receive home health care services. However, the following day she was admitted to the hospital once again, with complaints of shortness of breath and pain in her feet and back.

Ms. Hill was discharged from the hospital on June 12, 2003, and was subsequently re-admitted to the nursing home. Her treatment plan required further continuous administration of oxygen twenty-four hours a day. Ms. Hill developed additional health complications at the nursing

---

[1]The record shows the AAA announced that after January 1, 2003, it would no longer accept health care cases involving individual patients without a post-dispute agreement to arbitrate. The AHLA announced that after January 1, 2004, it ". . . will only administer consumer health care liability claims if an agreement to arbitrate was entered into in writing after the alleged injury occurred."

[2]At the hearing on the motion to compel arbitration, the plaintiffs' attorney asserted that the language in question on his copy of the contract was not in bold type. The trial court's order observed that "[w]hile the waiver of jury trial is set out in what appears to be a slightly blacker type color, it is certainly not emphasized, nor was it orally explained." Our examination of the contract confirms the trial court's observations as to the appearance of the jury waiver language.

home, and on the morning of June 21, 2003, NHC called for the defendant Medic One ambulance service to transport her to the emergency room.

When the Medic One emergency medical technician arrived at the nursing home, an NHC nurse disconnected Ms. Hill's oxygen. The EMT did not bring any oxygen to Ms. Hill's room. As he transported her from the third floor of the nursing home to the ambulance, she asked for oxygen, and then began gasping for breath. Once in the ambulance, the EMT began administering oxygen to Ms. Hill, but her condition worsened, and the EMT began Cardiopulmonary Resuscitation. She arrived at the emergency room where doctors continued CPR, but without success. Ms. Hill was pronounced dead at 11:45 a.m.

## II. LEGAL PROCEEDINGS

Barbara Hill's children filed a wrongful death complaint on October 8, 2003, naming NHC and Medic One as defendants.[3] They claimed that although NHC's employees knew that Ms. Hill was oxygen dependent, they disconnected her oxygen while she was still in her room, and they failed to re-connect it despite their awareness that the Medic One EMT did not have oxygen to give her. They further claimed that the NHC staff knew that the patient began having difficulty breathing as she was being transported to the ambulance while still on their premises. They contended that both defendants were negligent in failing to ensure that the patient had a continuing supply of oxygen, and that as a result of that negligence "Barbara Hill died a slow, painful, and agonizing death that was unnecessary."

On November 19, 2003, NHC filed a motion to compel arbitration and stay proceedings, accompanied by a memorandum of law and a copy of the Admission and Financial Contract. The parties agreed to postpone argument on the motion until the completion of certain discovery. After several depositions were taken, the defendant renewed its motion to compel arbitration. The trial court conducted a hearing on the motion on June 23, 2005. At the conclusion of the hearing, the trial court took the case under advisement. On July 1, 2005, the court issued a memorandum and order denying the defendant's motion.

In its order, the court discussed in detail the facts behind the execution of the Admission and Financial Contract, and discussed two recent opinions by this court which involved similar facts: *Howell v. NHC Healthcare-Fort Sanders, Inc.,* 109 S.W.3d 731 (Tenn. Ct. App. 2002) and *Raiteri v. NHC Healthcare/Knoxville, Inc.,* No. E2003-00068-COA-R9-CV, 2003 WL 23094413 (Tenn. Ct. App. Dec. 30, 2003)(no Tenn R. App. P. 11 application filed). In both those cases, we found the arbitration clauses at issue were unenforceable because they were unconscionable. The court

---

[3]The issues currently before this court do not involve Medic One. Accordingly, when we make reference to "the defendant" in this opinion, we mean NHC Healthcare only.

reasoned that the similarities between those cases and the one before it compelled the same result. This appeal followed.[4]

## III. STANDARD OF REVIEW

When ruling on the appeal of a denial of a motion to compel arbitration, we must follow the standard of review that applies to bench trials. *Spann v. American Express Travel Related Services Co.*, 224 S.W.3d 698, 706-07 (Tenn. Ct. App. 2006); *Cabany v. Mayfield Rehabilitation and Special Care Center,* M2006-00594-COA-R3-CV, 2007 WL 3445550 at *3 (Tenn. Ct. App. Nov. 15, 2007) (petition to rehear denied Nov. 27, 2007); *Hubert v. Turnberry Homes, LLC*, No. M2005-00955-COA-R3-CV, 2006 WL 2843449, at *2 (Tenn Ct. App. Oct. 4, 2006) (no Tenn. R. App. P. 11 application filed). Under that standard, review of the trial court's findings of fact are "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d).

If the trial court has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Hardcastle v. Harris*, 170 S.W.3d 67, 78-79 (Tenn. Ct. App. 2004). Questions of law are likewise reviewed de novo without a presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993); *Hicks v. Cox*, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998).

## IV. ISSUES PRESENTED

The issue in this appeal is whether the trial court erred in denying NHC's motion to compel arbitration. On appeal, in asserting that the trial court did err, NHC makes several arguments: (1) that the trial court should have applied the Federal Arbitration Act ("FAA"), which has a "potential pre-emptive effect on contrary state law;" (2) that the trial herein mistakenly relied on two cases from the Eastern Section of this court, and the reasoning of those cases was contrary to federal law because the court applied a heightened scrutiny to the arbitration clause; (3) that an arbitration clause in a contract for medical services is not unconscionable where it does not attempt to limit the provider's liability; (4) that arbitration itself is not oppressive, so agreements to arbitrate are not unconscionable; (5) that, considering the facts of this case, the agreement herein is not unconscionable and should be enforced; and (6) that the agreement is enforceable, despite the refusal of the arbitration bodies referenced in the agreement to conduct the arbitration.

The plaintiffs address the issues raised by NHC, arguing that the FAA does not preclude reliance on the earlier opinions from this court; that the trial court had sufficient grounds in law and evidence to hold that the agreement was unenforceable; that there was a sufficient showing that

---

[4]Tenn. Code Ann. § 29-5-319 allows a party to file a direct appeal to the Court of Appeals of a trial court's order denying an application to compel arbitration or granting an application to stay arbitration, without implicating the requirement of a final order in the case as is set out in Tenn. R. App. P. 3.

arbitration would have been cost prohibitive for the plaintiffs; and that the refusal of AAA and AHLA to arbitrate this type of dispute made agreement unenforceable. The plaintiffs also argue that the arbitration agreement is not enforceable because it violates Medicare and Medicaid law.

Our courts have recently considered the enforceability of an agreement to arbitrate disputes, which necessarily includes a waiver of the right to a jury trial, in nursing home admission agreements. While those cases involved several factual scenarios and raised various issues, many of the issues raised in this case were also raised in other cases, and most were recently resolved by the Tennessee Supreme Court.

On November 8, 2007, the Tennessee Supreme Court issued an opinion in the case of *Owens v. National Health Corporation et al*, No. M2005-01272-SC-R11-CV, 2007 WL 3284669 (Tenn. Nov. 8, 2007). Following the filing of a petition to rehear by NHC, the Court, by order entered February 7, 2008, granted in part and denied in part the petition to rehear and filed a substitute opinion that modified footnote 4 of its earlier opinion. *Id.*, at * 12. We will, of course, refer to the substituted opinion.[5]

## V. THE HOLDINGS IN *OWENS*

A central issue in *Owens* was whether a durable power of attorney for healthcare authorized an attorney-in-fact to bind a nursing home resident to arbitration and to waive her right to trial by jury. Although that question is not at issue in the present case, the Supreme Court's pronouncements in *Owens* on other issues relating to the enforceability of the arbitration agreement included in nursing home admission agreements are directly on point with the issues in this case.

The *Owens* case involved allegations of malpractice against a nursing home, and an Admission and Financial Contract with an arbitration clause whose quoted portions are identical to the language in the contract before us.[6] With regard to arguments propounded by the parties in *Owens* that are also raised in the case before us, we will discuss more fully below the Supreme Court's treatment of the issue of the application of federal or state law. The Court's rulings on other issues common to both *Owens* and the case before us can be dealt with more summarily.

First, the Court, following authority from other states, held that the arbitration agreement in the nursing home contract did not violate either federal law or regulation governing the Medicaid program because requiring the patient to agree to arbitrate does not constitute an additional fee or other consideration as a precondition for admission. *Owens*, 2007 WL 3284669, at *9-10. The

_____

[5] For some weeks, the newer opinion appeared at 2007 WL 4877915. However, the substitution has now been made, and the newer opinion appears, as the only opinion, at 2007 WL 3284669. The only differences from the originally-filed opinion is an addition to footnote 4, not relevant herein, and a change in the placement of the footnotes at the end after the order on petition to rehear.

[6] While the exact relationship between the corporate defendant in *Owens* and the corporate defendant before us is unclear, the similarities between their names and the contracts they used are obviously not the products of coincidence alone. We also note that the same individuals are attorneys of record for the defendants in both cases.

Court also rejected the plaintiff's argument that pre-dispute arbitration agreements in nursing home contracts are per se invalid as contrary to public policy. *Id.*, at *10-11.

The contract in *Owens* included the same language as the contract herein stating that arbitrations of disputes would be done by the American Arbitration Association or the American Health Lawyers Association. Since neither of those organizations any longer conducts arbitrations of health care claims in which the agreement to arbitrate pre-dates the dispute, the plaintiff in *Owens* asserted that the contract was unenforceable. The plaintiff in this case makes the same argument. In *Owens*, the Supreme Court rejected that argument on the basis that Tennessee Code Annotated § 29-5-304 provides that when an agreed-upon arbitrator is unavailable, the court may appoint an arbitrator. *Id.*, at *8. The Court also rejected the plaintiff's claim that the specification of the two arbitration organizations was a material term of the contract requiring failure of the contract if those organizations are unavailable. *Id.*

This court is, of course, bound by the holdings of the Tennessee Supreme Court in *Owens*. Consequently, we must reject the same arguments put forth herein.

## VI. FEDERAL OR STATE LAW

NHC contends that the Federal Arbitration Act governs the arbitration provision at issue because of the interstate nature of commerce conducted by NHC. It further argues that the FAA prohibits state law treatment of agreements to arbitrate that is unequal to or more burdensome than treatment of other types of contracts. According to NHC, the two cases relied on by the trial court placed additional conditions on, or applied a heightened scrutiny to, arbitration agreements that are not placed on other contracts.

The plaintiffs herein argue that the FAA and the Tennessee Arbitration Act are similar in the relevant provisions, and the trial court found there was not much difference in the application of the two statutes. In any event, both federal and state law allow courts to apply state law defenses to contract enforcement of arbitration provisions and to decline to enforce such a provision "upon such grounds as exist at law or inequity for the revocation of any contract." Tenn. Code Ann. § 29-5-302; *Doctor's Assoc., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (holding that generally applicable contract defenses, including unconscionability, may be applied to invalidate arbitration agreements without contravening the FAA). The trial court herein based its decision on the generally applicable contract defense of unconscionability. Consequently, the unequal state law argument under the FAA does not apply. We find no error in the trial court's consideration of the defense of unconscionability.

Although the defendant in the *Owens* case made the same FAA-based argument, the Supreme Court did not resolve the issue, finding it unnecessary in light of the contract's choice of law provision. *Owens*, 2007 WL 3284669, at *4-5. That provision stated "[t]his agreement for binding arbitration shall be governed by and interpreted in accordance with the laws of the State where the Center is licensed." The *Owens* court, relying on *Volt Info Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 109 S. Ct. 1248 (1989), held that parties to an arbitration agreement are free to choose to have their agreement governed by a particular state's arbitration act.

Accordingly, the Court held that the case was governed by the Tennessee Uniform Arbitration Act and not the FAA. *Owens*, 2007 WL 3284669, at *4-5.

The contract in the present case contains identical language to the choice of law provision in *Owens*, quoted above, and the defendant does not dispute that it is licensed to do business in Tennessee. Accordingly, we hold that the Tennessee Arbitration Act is to be applied herein.

The holdings in the *Owens* opinion resolve all the issues in this case except one: the question of unconscionability.

## VII. UNCONSCIONABILITY

Like its federal counterpart, Tennessee's version of the Uniform Arbitration Act states that "a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract." Tenn. Code Ann. § 29-5-302(a). Consequently, when determining whether there is a valid agreement to arbitrate, courts apply generally applicable state law governing the formation of a contract. *Taylor v. Butler*, 142 S.W.3d 277, 284 (Tenn. 2004). Applicable grounds for refusing to enforce a contract may include the defenses of laches, estoppel, waiver, fraud, duress and unconscionability. *Spann v. American Express*, 224 S.W.3d 698, 711 (Tenn. Ct. App. 2006).

The defense of unconscionability was raised in *Owens*, but had been pretermitted in the trial court by its ruling that the attorney-in-fact did not have authority to bind the patient to arbitration. Consequently, the factual record on appeal was too limited to allow the Supreme Court to resolve the issue of unconscionability, which requires an intensely fact-driven inquiry. *Owens*, 2007 WL 3284669, at *11.[7] Nonetheless, the Court recognized the viability of unconscionability as a defense to an agreement to arbitrate within a nursing home services contract and restated the well-known principles:

> A contract may be unconscionable if the provisions are so one-sided that the contracting party is denied an opportunity for a meaningful choice. *Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984) (quoting *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 274 S.E.2d 206, 210 (N.C. 1981)). In making that determination, a court must consider all the facts and circumstances of a particular case. *Id.* The scant factual record in this case does not disclose the circumstances under which Daniel signed the arbitration agreement on behalf of King, including whether the arbitration agreement was offered on a "take it or leave it basis." *Buraczynski*, 919 S.W.2d at 320; *see generally Howell v. NHC Healthcare-Fort*

---

[7] Subsequent cases have also been remanded for development of the factual record. *See, e.g., Raines v. National Health Corporation*, No. M2006-1280-COA-R3-CV, 2007 WL 4322063, at * 7-8 (Tenn. Ct. App. Dec. 6, 2007). In *Cabany*, this court remanded for consideration of the question of whether the power of attorney was effective, but also noted that the trial court could also address on remand the issue of whether the agreement was a "contract of adhesion." 2007 WL 3445550, at n. 19.

*Sanders, Inc.*, 109 S.W.3d 731 (Tenn. Ct. App. 2003) (reviewing the trial court's findings of fact and holding that an arbitration provision in a nursing-home contract was unconscionable and therefore unenforceable).

*Owens*, 2007 WL 3284669, at * 11.

Arbitration agreements between medical providers and patients are not *per se* void as against public policy. *Buraczynski v. Eyring,* 919 S.W.2d 314 (Tenn. 1996). However,

> . . . in general, courts are reluctant to enforce arbitration agreements between patients and health care providers when the agreements are hidden within other types of contracts and do not afford the patients an opportunity to question the terms or purpose of the agreement. This is so particularly when the agreements require the patient to choose between forever waiving the right to a trial by jury or foregoing necessary medical treatment, and when the agreements give the health care provider an unequal advantage in the arbitration process itself.

*Buraczynski,* 919 S.W.2d at 321.

The question of whether a contract provision, including a provision agreeing to arbitration,[8] is unconscionable, is a question of law. *Taylor*, 142 S.W.3d at 284-85. However, in reaching a decision on the question of unconscionability of a contract or provision, a court must consider the circumstances surrounding the agreement and its execution, including the setting, the purpose, and the effect. *Taylor*, 142 S.W.3d at 285 (quoting RESTATEMENT (SECOND) OF CONTRACT § 208, cmt. a (1981)). In the case before us, the trial court made findings of fact, which we find are supported by the evidence. Those findings and the holdings based thereon are set out in the order:

> The record in this case indicates that the deceased was 60 years old but that she was under some mental and significant physical infirmity and under pressure of medical circumstances to obtain admission at the nursing home. There is no indication here that the resident was given an explanation of the terms or the purpose of the arbitration agreement, nor that any special attention was given by the admissions employee to the arbitration agreement. The deceased did not read the agreement, and her daughter testified that the social worker did not discuss medication, arbitration, or waiver of jury trial. The proof is that the agreement would not be altered by the defendant and that the deceased had to sign the agreement as written in order to be admitted. It was "take it or leave it." The Court is further troubled by the fact that the arbitration process can only be accessed, according to the agreement, by the posting of monies by the plaintiff in excess of several thousand dollars. Furthermore, there is no explanation of how arbitration works, and the admissions employee who

---

[8]If a void or unenforceable agreement to arbitrate, incorporated into a larger agreement, is collateral to the contractual matters or not part of the substance of the larger agreement, it is severable. *Taylor*, 142 S.W.3d at 287. An arbitration agreement dealing only with remedies, which is generally all they deal with, is severable. *Id.*

-8-

went over the contract with Ms. Hill was not even clear how arbitration worked. While the waiver of jury trial is set out in what appears to be a slightly blacker type color, it is certainly not emphasized, nor was it orally explained. Ms. Hill entered the nursing home on May 29, 2003 and signed the agreement on that date. There was no showing of any actual bargaining over the terms. The agreement called for arbitration to be administrated either by the American Arbitration Association ("AAA") or the American Health Lawyer's Association ("AHLA"). Interestingly, the AAA had ceased to do arbitration of nursing home cases January 1, 2003. The AHLA ceased providing this service January 1, 2004. both organizations were concerned about the 'controversial" nature of requiring nursing home residents to enter into arbitration agreements. More specifically as relates to this case, however, the AAA had ceased to do arbitration of these claims six months prior to Ms. Hill's entering into this agreement. Defendant offers no explanation as to why the AAA remained in the agreement when the defendant knew or should have known that the AAA would no longer provide an arbitrator. Since Ms. Hill is now deceased, it is not possible to determine what effect the inclusion of the AAA had in any decision she made, but the AAA is a highly respected organization; its inclusion in the contract might have had some effect on her willingness to enter into an arbitration agreement. As pointed out, the inclusion of the AAA was inappropriate as they had ceased to do arbitration of these kinds of cases effective January 1, 2003.

The admissions contract herein containing the arbitration provision is a contract of adhesion. It was a standard form contract drafted by the nursing home and was presented to the patient on a take-it or leave-it basis. She clearly had no bargaining power, needed the care the nursing home offered, and would not have been admitted if she did not sign. Thus, the contract meets the definition of an adhesion contract set out in *Buraczynski*:

> An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." Professor Henderson has observed that "the essence of an adhesion contract is that the bargaining position and leverage enable one party 'to select and control risks assumed under the contract." Courts generally agree that "[t]he distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms."

*Buraczynski,* 919 S.W.2d at 320 (citations omitted).

The conclusion that the admissions contract herein was an adhesion contract does not, however, end the inquiry. Contracts of adhesion are not favored and must be closely scrutinized to determine if unconscionable or oppressive terms are imposed which prevent enforcement of the agreement. *Id.* at 316. Nevertheless, such contracts are enforceable unless they are found to be "beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Id.* at 320. A contract may be found to be unenforceable on grounds of unconscionability where the

"inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Taylor,* 142 S.W.3d at 285 (quoting *Haun*, 690 S.W.2d at 872). "In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable." *Haun*, 690 S.W.2d at 872.

The arbitration agreements at issue in *Buraczynski*, between an orthopedic surgeon and two of his patients, were not contained within a hospital or clinic admission contract, but were separate one-page documents which explained the meaning of the agreement to arbitrate and encouraged the patient to discuss the agreement with the doctor. The statement that "by signing this contract you are giving up your right to a jury or court trial" was in capital letter red type directly above the signature line. The patients were given the right to revoke the agreements for any reason within thirty days of their execution. The court found that the terms of the agreements did not give the doctor an unfair advantage over the patient, and noted that, "[t]he agreements contain no buried terms." *Buraczynski*, 919 S.W.2d at 321.

After weighing those facts, the court concluded that the arbitration agreements at issue "can not be construed as unconscionable, oppressive, or outside the reasonable expectations of the parties. As such, the agreements, though contracts of adhesion, are enforceable." *Id.* Significant, or even "most important" to that conclusion was the Court's determination, that "the agreements did not change the doctor's duty to use reasonable care in treating patients, nor limit liability for breach of that duty, but merely shifted the disputes to a different forum." *Id.* Accordingly, the Court determined that the arbitration provisions in the agreements at issue could not be construed to be unconscionable, oppressive, or outside the reasonable expectations of the parties. *Id.* As a result, the agreements were enforceable. *Id.*

The facts of the case before us differ somewhat from those surrounding the agreements in *Buraczynski*. Herein, the arbitration clause was not contained in a separate one-page document, but was contained on pages 11 and 12 of the lengthy admissions contract. It is not at all clear that the text indicating the patient's surrender of her right to a jury trial was sufficiently distinct from the rest of the contract to alert her to the fact that she was giving up such an important right. Section 3(a) of the arbitration clause stated that the parties agreed that either of them could initiate a claim pursuant to the AAA rules for "resolution of consumer-related disputes" but that "there are limits to the dollar amounts which can be arbitrated pursuant to these rules." The provision did not explain what those limits were. This type of arbitration "consumer-related disputes," is "based upon written documents." "All other disputes [presumably those exceeding the dollar limits of consumer-related disputes and, perhaps, those that are not amenable to resolution by review of documents only] shall be arbitrated in accordance with the AAA 'Commercial Dispute Resolution Procedures.'" The provision then referred to the AAA and the AHLA websites for information regarding those procedures. There is nothing to indicate that the patient seeking admission to the nursing home is given access to a computer and the opportunity to review those rules, even if the patient could anticipate which type of dispute might arise and, therefore, which set of rules would apply.

While the agreement stated that any "claim, controversy, dispute, or disagreement" not resolved through optional mediation "shall be resolved by binding arbitration," it contained no explanation of binding arbitration, nor any language that would encourage the patient to ask questions about the process. Unlike the agreement in *Buraczynski*, the arbitration provision herein did not give the patient 30 days or any other period of time within which to withdraw consent to the provision. As the trial court found, Ms. Hill was under "some mental and significant physical infirmity and under pressure of medical circumstances to obtain admission at the nursing home." As the trial court also found, there was no proof that she was given an explanation of the terms or the purpose of the arbitration agreement. The trial court summed up that "furthermore, there is no explanation of how arbitration works, and the admissions employee who went over the contract with Ms. Hill was not even clear how arbitration worked."[9]

Based on the factual findings set out earlier, the trial court herein relied on two opinions from this court, *Howell v. NHC Healthcare-Fort Sanders, Inc.,* 109 S.W.3d 731 (Tenn. Ct. App. 2003), and *Raiteri v. NHC Healthcare/Knoxville, Inc.,* No. E2003-00068-COA-R9-CV, 2003 WL 23094413 (Tenn. Ct. App. Dec. 30, 2003) (no Tenn R. App. P. 11 application filed), quoting parts of those opinions in its final order. The trial court held that the nursing home's motion to compel arbitration was "against the standards set forth in Howell and Raitieri" and found the agreement to arbitrate to be unenforceable.

In *Howell v. NHC Healthcare-Fort Sanders, Inc.,* 109 S.W.3d 731, the plaintiff signed an eleven page nursing home admission form on behalf of his wife, who had been discharged from the hospital, but was too sick to return home. The arbitration provision was "buried" on page ten of the agreement. The proof indicated that if the plaintiff had not signed the contract, his wife would not have been admitted. Although the plaintiff could sign his name, he was unable to read or write, so a nursing home employee explained the contract to him. She testified that she explained the dispute resolution procedure, but she admitted that she did not explain that by signing the contract the plaintiff was giving up his wife's right to a jury trial. The plaintiff testified that he did not remember anyone using the term arbitration, that he had never heard the term, that he did not know what it was, and that it was not explained to him. His daughter, who was present at the execution of the document testified that she did not remember hearing the words "arbitration," "mediation," or "dispute resolution."

*Raiteri v. NHC Healthcare/Knoxville, Inc.,* 2003 WL 23094413, involved a 75 year old man signing what appears to have been the same Admission and Financial Contract as was involved in the *Howell* case so that his 77 year old wife could be admitted to the defendant nursing home.

---

[9]Although Ms. Hill signed the box containing the statement "[t]he provisions of this Section H have been reviewed with me prior to my signature below," there was no evidence that was actually the case. Her daughter testified that Ms. Hill did not read it and that she (the daughter) only read the front pages dealing with costs. It is axiomatic that a party may not be allowed to deny an obligation assumed under a signed contract by simply pleading that she did not read or did not understand the contract. *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001); *Giles v. Allstate Insurance Co.,* 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993). Nonetheless, the facts and circumstances surrounding the execution of an agreement are relevant to the question of its unconscionability.

Unlike Mr. Howell, the husband in the *Raiteri* case could read, and the defendant's admitting coordinator testified that he had read the agreement. She also testified that she had explained the agreement to him. The proof also showed that the husband was very upset and very confused after he signed the agreement, that he was crying, and that he told his stepdaughter and his son that putting his wife in the nursing home was his only choice because he was physically unable to take care of her.

This court held in both cases that the agreement was unenforceable. We cited the difficult circumstances under which the contracts were executed, the lack of meaningful choice for the signatories, and the fact that the arbitration provisions were not contained in a stand-alone document. In *Howell*, this court relied upon prior authority that required the party seeking to enforce an arbitration agreement to show that the parties "actually bargained over the arbitration provision or that it was a reasonable term considering the circumstances." *Howell*, 109 S.W.3d at 734. The court also found that since the waiver of a jury trial must generally be both knowing and clear, evidence that the patient was informed that the agreement to arbitrate included a waiver of the right to a jury trial was important. *Id.*[10]

In a recent post-*Owen* case, this court held that a disputed arbitration agreement in a nursing home admission agreement was enforceable. In *Philpot v. Tennessee Health Management, Inc.,* No. M2006-01278-COA-R3-CV, 2007 WL 4340874 (Tenn. Ct. App. Dec. 12, 2007), the patient had been a resident at one nursing home and wished to change to a different one after a brief stay at the hospital. The patient's son, who acted as her attorney-in-fact, claimed that it was urgent for him to find a facility for his mother. The record showed, however, that the urgency "was due in principal part to the plaintiff's desire to attend to this matter during his lunch break." *Philpot*, 2007 WL 4340874 at *6.

In *Philpot*, the plaintiff complained that the complex admissions packet he was presented included many documents and that he did not realize he was giving up the right to a jury trial. However, the arbitration agreement was in a separate two-page document titled in large bold letters at the top of the page "**JURY TRIAL WAIVER AND DISPUTE RESOLUTION PROCEDURE**." The jury waiver provision itself was found in two separate places on the document and was likewise displayed in bold capital letters in both places, while another section titled **BINDING ARBITRATION** in bold letters set out the circumstances under which arbitration would come into play. An employee of the nursing home explained the admissions documents to the plaintiff, and the plaintiff did not argue that the agreement was unclear or that he was not given

---

[10] We note that the Tennessee Supreme Court in *Buraczynski* held that the agreement to arbitrate and to waive trial by jury could not be construed as "unconscionable, oppressive, or outside the reasonable expectations of the parties." *Buraczynski*, 919 S.W.2d at 321. We do not believe that the agreement to waive jury trial, which is axiomatically a part of an agreement to arbitrate disputes, triggers a higher burden to show the agreement is enforceable. To hold otherwise would violate the FAA because the courts would be treating arbitration agreements differently from other types of contracts. *See Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 103-107 (Ill. 2006) (discussing the issue "knowing and voluntary waiver" of a right, in that case a statutory right, and the inconsistency of that standard with the FAA).

-12-

additional time to read the agreement or to ask questions. Further, it was uncontroverted that the plaintiff was familiar with at least one other nursing home in the area.

In another post-*Owen* decision, *Reagan v. Kindred Healthcare Operating, Inc.*, No. M2006-02191-COA-R3-CV, 2007 WL 4523092 (Tenn. Ct. App. Dec. 20, 2007) (Tenn. R. App. P. 11 application filed Feb. 15, 2008), this court also found the arbitration agreement in a nursing home admissions setting was enforceable. Central to this holding was the determination that the arbitration agreement was not a contract of adhesion because it was clearly voluntary, and was explained as voluntary, and was not a prerequisite to admission or services. Consequently, it was not a "take it or leave it" situation, and the patient "was not forced to choose between forever waiving the right to a jury trial or foregoing necessary medical treatment." *Reagan*, 2007 WL 4523092, at *15. Further, the arbitration agreement was not part of the admissions contract, but was a separate standalone agreement, clearly marked, and clearly defining arbitration as including the waiver of the rights to a trial (by a jury or a judge) and to an appeal. The patient was informed that any dispute regarding her care would be settled through arbitration instead of in court and that she could revoke her agreement within 30 days. *Id.* The court also found that the agreement did not change the duties or liabilities between the parties, but "merely shifted disputes to a different forum." *Id.* (citing *Buraczynski*, 919 S.W.2d at 316).

Again, the facts in the case before us differ from those in *Philpot* and *Reagan* in some meaningful ways. Some of the factors to be considered in a determination of unconscionability may be described as substantive, while others are more procedural. The concept of unconscionability is generally considered as including both unfairness in contract formation (procedural unconscionability) and unfairness in the terms of the contract (substantive unconscionability). *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C. Cir. 1965); E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 4.28, at 555-56 (2d ed. 1998). While this court has noted that "[i]n Tennessee we have tended to lump the two together" when defining unconscionability, *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.*, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001), we find the two component description helpful in analyzing this case.

With regard to substantive unconscionability, our Supreme Court has determined that an agreement to arbitrate, including one made in the context of the provision of medical services, is not generally unconscionable when its provisions do not alter legal duties or limit liabilities and simply provide an alternative forum for the resolution of disputes. *Buraczynski*, 919 S.W.2d at 321. However, inequality in the provisions of such an agreement, where the agreement is an adhesion contract, may result in a finding of unconscionability. *Taylor*, 142 S.W.3d at 286 (holding unconscionable and unenforceable an arbitration provision that allowed the dealer who drafted the agreement to retain judicial remedies beyond arbitration while limiting the customer's remedies to those available under the Arbitration Act). The question is whether the arbitration agreement is unreasonably favorable to the drafter of the contract. *Id.*

In the case before us, the fairness of the arbitration provisions can be questioned in two regards. The first involves the two types of arbitration described in the agreement. It is unclear to us how a consumer/patient would know at signing which type would apply or the consequences of the distinction (other than that the "consumer-related disputes" method involves only presentation

of documents).[11]  Because it is unclear how the different types of arbitration would impact a claimant, therefore making it difficult for us to determine whether the arbitration provisions favor the nursing home, the lack of clarity to a patient asked to sign before admission to the facility is a factor that is more properly considered in the procedural unconscionability analysis.

The second provision raising the question of whether the arbitration provision is unreasonably favorable to the nursing home is the one identified by the trial court.  Specifically, the trial court was "troubled by the fact that the arbitration process can only be accessed, according to the agreement, by the posting of monies by the plaintiff in excess of several thousand dollars."  The arbitration provision states, in pertinent part:

> The award of costs of the arbitration shall be determined by the arbitrator in accordance with state law.  The Administrative Fee and Arbitrator's compensation shall by initially advanced by the party requesting arbitration, but shall be allocated on the ratio of final award to each party over the total award in the final Arbitration Order.

In this appeal, NHC argues that the plaintiff had the burden of proving that the costs of arbitration will likely exceed the costs of litigation, citing *Cooper v. MRM Investment Co.*, 367 F.3d 493 (6th Cir. 2003), and *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 365 (Tenn. Ct. App. 2001), and that the plaintiffs herein did not meet that burden.  NHC asserts that there is insufficient proof in this record to demonstrate the prohibitiveness of the initial costs to access the arbitration procedure and that the trial court erred in relying on the evidence presented.  NHC also argues that the ability of the arbitrator to reallocate costs after arbitration makes the agreement enforceable regardless of initial costs to the plaintiffs to access arbitration.

Federal courts, including the United States Supreme Court, have recognized that, in some types of cases, an arbitration provision may not be enforceable if the costs of arbitration are prohibitively expensive and thereby prevent vindication of a party's rights.  *See Rosenberg v. Bluecross Blueshield of Tennessee*, 219 S.W.3d 892, 905-909 (Tenn. Ct. App. 2007) (discussing the development of the law in the federal courts).  The requirements for establishing unenforceability were the primary subject of the developing case law.  While those cases generally dealt with underlying claims based on federal statutes, because our courts have relied on some of those opinions, a brief discussion of them is helpful.

In *Green Tree Financial Corp. - Alabama v. Randolph*, 531 U.S. 79, 121 S. Ct. 513 (2000), the United States Supreme Court recognized that the costs of arbitration could be large enough to preclude a claimant from enforcing a right in the arbitral forum, making such an arbitration agreement unenforceable.  121 S. Ct. at 522.  However, the Court held that "when a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive,

---

[11]Apparently, claims over $75,000 were to be arbitrated under the commercial rules, including the fee schedule for such claims.  It is certainly foreseeable that claims of negligence in the provision of medical care, especially wrongful death claims, would exceed $75,000.

that party bears the burden of showing the likelihood of incurring such costs." *Id.* The court found that the fact that agreement was silent as to the costs of arbitration was not sufficient to establish cost prohibitiveness and that there was no proof that the cost of arbitration of the claim at issue would be any greater than the cost of litigation. *Id.* Unless a plaintiff proves that the costs of arbitration are prohibitively high, "the 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.*

In *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003), the Sixth Circuit explained that the Supreme Court had made "clear that statutory rights . . . may be subject to mandatory arbitration only if the arbitral forum permits the effective vindication of those rights." Id. at 658 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28, 111 S.Ct. 1647 (1991)). Consequently, a cost provision that effectively prevents vindication of a statutory right through arbitration makes the arbitration agreement unenforceable. *Id.* In other words, the alternative to a judicial forum, *i.e.*, arbitration, must be accessible as well as effective. *Id.*

The court adopted a test for cost-prohibitiveness that deviated from a strict case-by-case analysis and held that "potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are enough to deter them and similarly-situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum." *Id.* at 663. Essentially, the court determined that any cost provision, including one providing for cost-splitting depending on the result of the arbitration, is unenforceable if it would have a "chilling effect" that deterred enforcement of statutory rights. *Id.* at 661.

In *Morrison*, the court also reiterated that a court must evaluate the likely cost of arbitration relative to the likely costs of litigation.[12] The court found that the expenses of arbitration of some claims, depending the type and amount, may "range from three to nearly fifty times the basic costs of litigation in a judicial, rather than arbitral, forum." *Id.* at 669. Additionally, the court cautioned that courts should weigh the relative costs of litigation and arbitration "in a realistic manner" and that the comparison must be made "from the perspective of the potential litigant," meaning that the court must "consider the decision-making process of these potential litigants."[13] *Id.* at 663-64.

Following its holdings in *Morrison*, in *Cooper v. MRM Investment Co.*, 367 F.3d 493, the Sixth Circuit held that up-front costs must be considered, because such costs are a primary factor in a claimant deciding whether to pursue arbitration and, therefore, prohibitively high up-front costs could serve to deter potential claimants from pursuing their claims. *Id.* at 511. Thus, up-front costs

---

[12]The court also addressed the kind of proof that a party opposing arbitration should be required to produce, stating that "requiring the plaintiff to come forward with concrete estimates of anticipated or expected arbitration costs asks too much at this initial stage of the proceedings." *Id.* at 660. Similarly, the effects or results of a cost-shifting provision if the claimant is successful is also too difficult to prove at the stage where the claimant seeks to have the arbitration provision set aside. *Id.*

[13]In this analysis, the court would consider, not the financial resources of an individual plaintiff in detail, but the relative income of similarly situated employees. *Id.* at 665.

such as those required in the agreements before us should be considered, regardless of the potential for later recoupment.[14] Where costs to access the remedy provided in the agreement, *i.e.*, arbitration, are so high as to likely deter parties from seeking redress in that forum, an agreement to waive the right to redress in the courts is unenforceable. *Id*. (citing *Morrison*, 317 F.3d at 664-65). The court affirmed the trial court's determination that the up- front costs in the agreement before it would deter many employees from arbitrating their claims and stated that it had predicted, in *Morrison*, that "many courts would regularly find arbitration costs too high" for certain potential litigants to pursue vindication of their rights, rendering cost or cost-splitting provisions "unenforceable in many, if not most, cases." *Cooper*, 367 F.3d at 512 (citing *Morrison*, 317 F.3d at 665.)

Finally, in *Stutler v. T.K. Contractors, Inc*., 448 F.3d 343 (6th Cir. 2006), the Sixth Circuit made it clear that its prior opinions in *Morrison* and *Cooper*, as well as the Supreme Court's decision in *Randolph*, were limited to situations where the underlying claim was based on federal statute, *i.e.*, where federally statutorily created or protected rights were at stake. *Id*. at 345-46. Thus, the ground for refusing to enforce arbitration clauses because of prohibitive costs was based upon the concept that important rights created or protected by federal civil rights legislation should not be undermined by agreements that made vindication of those rights unlikely due to costs. *Id*. at 346. Where no federally protected interest is at stake, the enforceability of an arbitration agreement must be decided under state contract defenses.[15] *Id.*

A review of the cases from *Randolph* through *Stutler* confirms that those cases involved claims based on federal statutory rights such as civil rights statutes prohibiting employment discrimination. That review also demonstrates that the federal courts considered cost prohibitiveness in this context as a separate ground, based in federal statute, for refusing to enforce an arbitration agreement, independent from state-law-based unconscionability. The case before us involves claims based in state negligence law, so costs to pursue arbitration are relevant, if at all, as one of the considerations in the fact-based inquiry as to unconscionability.

Tennessee courts have issued several opinions since *Stutler* that deal, in part, with arguments that an arbitration agreement is not enforceable because it is cost prohibitive. Although only one of those cases specifically recognizes the Sixth Circuit's holding that a challenge to the enforceability of an arbitration agreement, when the underlying claim is not based on federal statute, must be determined under generally applicable state law, *see Rosenberg v. Bluecross Blueshield of Tenn., Inc*., 219 S.W.3d at 908-909, all three of them treat the *Pyburn v. Bill Heard Chevrolet* case as having established the law of this state regarding cost-prohibitiveness of arbitration. *Rosenberg*, 219 S.W.3d at 909; *Chapman v. H&R Block Mortgage Corp*., No. E2005-00082-COA-R3-CV, 2005 WL

---

[14]In fact, the Sixth Circuit said that *only* up front costs should be considered, and not the lower cost that may result from cost-realignment after arbitration. *Id*. at 511. We note this holding is contradictory to the holding in *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, as will be discussed more fully later in this opinion.

[15]*Stutler* involved state law claims for negligent misrepresentation, breach of contract, negligence, negligent hiring, and unjust enrichment. The court held there was no basis in the FAA or otherwise for the federal district court to pre-empt state law regarding arbitration agreements and, in fact, that the *Erie* doctrine precluded use of federal common law to invalidate an arbitration agreement where the underlying claims were based in state law. *Id*. at 347.

3159774, at *8 (Tenn. Ct. App. Nov. 28, 2005); *Flanary v. Carl Gregory Dodge of Johnson City, LLC*, No. E2004-00620-COA-R3CV, 2005 WL 1277850, at *4 (Tenn. Ct. App. May 31, 2005) (perm. app. denied Dec. 5, 2005).

We do not disagree as to *Pyburn*'s relevance, but cannot conclude that it is controlling as to the issues raised in this case. First, *Pyburn*'s holding regarding costs of arbitration was explicitly based upon *Green Tree Financial Corp.-Alabama v. Randolph*, decided by the United States Supreme Court in 2000. Consequently, the *Pyburn* court considered the prohibitive cost argument as a separate ground for holding an arbitration agreement unenforceable and not as a factor relevant to unconscionability. As *Stutler* later clarified, that independent ground does not apply where the underlying claim is not based on a right created or protected by federal statute. Because the *Pyburn* court did not examine cost provisions of an arbitration agreement using the standards for unconscionability, its conclusions on such provisions are not determinative in an analysis using those standards.

Second, *Pyburn*, issued in 2001, was decided before the Sixth Circuit's holdings in *Morrison* and *Cooper*. Consequently, it did not take into consideration the development in the federal law regarding costs of arbitration as a deterrent to pursuing a claim. Therefore, we do not consider as binding, as the final statement of Tennessee law on the question, or as determinative to the case before us, some of the *Pyburn* conclusions regarding costs in arbitration provisions. We do not disagree that the party seeking to invalidate an arbitration agreement on the ground that the costs are too great has the burden of proving such costs. *Pyburn*, 63 S.W.3d at 363. We also do not disagree that the costs of arbitration should be compared to the costs of litigation, *Id.*, because an enforceable agreement to arbitrate substitutes that forum for the judicial forum otherwise available to a claimant. However, we disagree that a provision that allows costs to be shifted to the drafter of the arbitration agreement if that party loses in the arbitration makes the agreement enforceable. *Id.*

Instead, we believe that up-front costs should be considered because the arbitration agreement may unreasonably favor the drafter of the agreement since such high up-front costs will deter the pursuit of claims. This is particularly true when the up-front costs of arbitration are disproportionately high compared to the initial costs of instituting litigation. In such cases, the drafter of the agreement stands to avoid litigation, because the other party has agreed not to pursue it, and to avoid arbitration, because the costs are so high as to prohibit many claimants from pursuing a remedy in that forum. Thus, we conclude that an agreement to arbitrate that places excessive costs on the claimant as a precondition to arbitration may be unconscionable because of the inequality of the bargain, the oppressiveness of the terms, or the one-sided advantage to the drafter. Consequently, the costs to initiate or pursue arbitration of the wrongful death claim in the case before us is a factor to be considered in determining whether the agreement to arbitrate is enforceable.

NHC's argument that the proof in this record is insufficient is based upon the fact that the plaintiffs' proof regarding initial cost relied upon the rules and fee schedules of AAA and AHLA. Since the proof also established that neither of those entities would conduct the type of arbitration

involved herein, NHC asserts that costs tied to them were not relevant.[16] We are unconvinced by this argument. At the time the admissions agreement was accepted by the patient, NHC intended that the schedules of AAA or AHLA would apply. As the drafter of the agreement, and presumably with superior knowledge as to the arbitration provisions, NHC cannot deny the relevancy of the costs identified by it in the agreement. *See Morrison*, 317 F.3d at 676-77 (stating that "[b]ecause the employer drafted the agreement, the employer is saddled with the consequences of the provision *as drafted*"). Further, we agree with the *Morrison* court's discussion of the type of proof as to projected costs that a potential litigant can offer at this early stage of a dispute.[17] Proof of costs calculated according to the agreement that NHC is trying to enforce is relevant and is sufficient to raise the issue of cost prohibitiveness, particularly when there was no proof that these costs were higher than or significantly different from costs of arbitration by other entities.

The proof shows that the likely costs to simply initiate an arbitration under the agreement are very high, perhaps reaching $18,000. We, like the trial court, find this troubling. The cost to initiate litigation would be considerably less. The arbitration agreement, an adhesion contract, is of a distinct benefit to its drafter, NHC, if its cost provisions serve to deter claims. A party who has been damaged by the actions of NHC cannot seek redress in the courts if the arbitration agreement is enforced, but may, due to expense that would not accompany the initiation of litigation, be precluded from seeking relief in the arbitral forum. We do not disagree that a party who was fully informed of the potential costs, having weighed all the risks and benefits, may agree to arbitrate disputes, as many businesses have done. However, in the situation where the arbitration agreement is a contract of adhesion and there is no proof that the claimant had any information upon which to make a fully informed choice, or that any other meaningful choice was available, benefit to the drafter calls into question the enforcement of the agreement.

As to the question of procedural unconscionability, some of the circumstances relevant to determining whether an agreement is a contract of adhesion are also relevant to the question of whether the agreement was fairly entered into. In addition, the prominence and clarity of the questioned provision should be considered. In the case before us, the agreement to arbitrate and waive the right to judicial determination of any dispute was contained within a multi-page agreement for admission to the nursing home, unlike cases where the arbitration agreement was a separate, clearly identified document. The provision in the case before us did not explain arbitration in any detail, and no such explanation was otherwise offered. The provisions are less than clear in several particulars, and certainly did not place a patient on notice that large fees might be required as a prerequisite to pursuing any claim against the nursing home.

In this case, the patient was discharged from the hospital but was not well enough to return home, and her need for nursing home services was immediate. Multiple serious medical conditions made her oxygen-dependent. Mr. Houmes testified that Ms. Hill would not have admitted to the

---

[16]NHC's brief asserts that the trial court "erred in relying upon the Plaintiffs' evidence of costs related to arbitration as being prohibitively expensive considering the unavailability of the forums cited for proof."

[17]Adding to the uncertainty in this case is the fact that no other arbitrator or entity has been identified.

nursing home if she did not sign everywhere the contract required. Ms. Hill lacked bargaining power. Neither Ms. Hill nor her children were given time after admission to seek clarification of the arbitration provision, such as determining the amount of up-front costs, or to later revoke agreement to the arbitration provision.

As set out earlier, the question of unconscionability requires courts to consider all the facts relating to a contract's purpose and effect as well as to the setting in which it was signed. One particular fact may not be the determinative factor; instead, it is the overall situation that must be considered. Under all the facts and circumstances of this case, we agree with the trial court that the arbitration provision was unconscionable and should not be enforced.

## VIII.

The order of the trial court is affirmed.  We remand this case to the Circuit Court of Davidson County for any further proceedings necessary.  Tax the costs on appeal to the appellants, NHC Healthcare/Nashville, LLC and National Healthcare Corp.

_____
PATRICIA J. COTTRELL, JUDGE